## GOLDSMITH v. ERWIN.

### No. 6106.

United States Court of Appeals
Fourth Circuit.

Argued June 14, 1950.

Decided July 26, 1950.

Albert Adams and C. R. Wharton, Greensboro, N. C. (George A. Ferris, New York City, A. W. Sapp, Richard L. Whar-

ton, Greensboro, N. C., Ferris & Adams, New York City, and Smith, Wharton, Sapp & Moore, Greensboro, N. C., on brief), for appellant.

George A. Long, Graham, N. C. (R. M. Robinson, Greensboro, N. C., on brief), for appellee.

Before PARKER, Chief Judge, and SOPER, Circuit Judge, and WYCHE, District Judge.

WYCHE, District Judge.

This action was instituted by J. Z. Erwin, trading as Erwin-Sutton Hosiery Mills, against Sheertex Hosiery, Inc., and A. Phillip Goldsmith for $25,850.79, for goods alleged to have been sold to A. Phillip Goldsmith and shipped and delivered to Sheertex Hosiery, Inc. Plaintiff was unable to obtain valid service upon the corporate defendant, and for this reason the action was dismissed as to Sheertex Hosiery, Inc. The jury returned a verdict in favor of the plaintiff for $25,850.79. The appeal from the judgment raises two questions: (1) Was there sufficient evidence to submit to the jury that the defendant A. Phillip Goldsmith agreed, as an original promisor, to pay for merchandise delivered to Sheertex Hosiery, Inc., and (2) Did the Trial Judge commit error in his Charge to the jury.

The evidence most favorable to the plaintiff discloses that: The plaintiff during the times of the transactions involved herein was the owner of a hosiery mill at Graham, North Carolina, which manufactured hosiery in the greige, and the defendant was the president of Diamond Full Fashioned Hosiery Mills, a large mill in High Point, North Carolina, and was also president and a majority stockholder of Sheertex Hosiery, Inc., a New Jersey corporation, with its principal office and place of business at Woodbury, New Jersey, and the defendant individually and as president of Sheertex Hosiery, Inc., Diamond Full Fashioned Hosiery Mills and other hosiery mills, maintained a New York office at 385 Fifth Avenue.

In the early part of 1946, the defendant had discussions with the plaintiff in High Point and Graham, North Carolina in which it was developed that the defendant was interested in buying goods in the greige from the plaintiff. In these conversations it was indicated that if the parties could agree, the defendant would purchase the entire output of plaintiff's mill. The plaintiff told the defendant that he could not supply the greige goods unless he could obtain additional yarn, and that he was then doing business with Crescent Hosiery Company of New York, but that he was unable to obtain an adequate supply of yarn from this source. However, it was agreed that the plaintiff would ship to the defendant one hundred dozen hose as a test lot in order to see if the defendant approved of plaintiff's goods when finished. The defendant told plaintiff that if he sent them he would send a check immediately in payment thereof; that he wanted the goods for himself. According to instructions the one hundred dozen lot was sent to a processor in Philadelphia. Nothing definite was said in this conversation about prices, since both parties knew that OPA prices prevailed.

Sometime later plaintiff went to New York for a further conference with defendant. In this conversation defendant told plaintiff that he wanted the goods for himself and that he would see that he was paid promptly for them on each Friday after receipt of invoices and goods; that if plaintiff would let him know what his needs would be that he would send enough yarns to take care of the goods shipped to him until the contract with Crescent was terminated; that he would send shipping instructions later. No mention was made by defendant at that time of Sheertex Hosiery, Inc., or of any of the other mills of which defendant was president. It was understood by plaintiff that defendant was negotiating for the purchase of the goods in his own behalf.

Sometime after the conversation with defendant in New York, plaintiff received the following letter of instructions from defendant, dated March 19, 1946: "For your information please, all merchandise is to be billed to Sheertex Hosiery, Inc., Woodbury, New Jersey with carbon copies of all invoices to my personal attention in

New York. Cordially yours, Sheertex Hosiery, Inc. A. Phillip Goldsmith, Pres." Signed, "A. Phillip Goldsmith". This was the first mention made to plaintiff of Sheertex Hosiery, Inc.

After receipt of the letter dated March 19, 1946, the plaintiff next saw defendant in High Point, North Carolina, at which time plaintiff took up the matter of the billing of goods with defendant. As to to this conversation the plaintiff testified as follows: "I took the matter up with him on the second trip to High Point and asked him if it would be all right to either bill the goods to him or Diamond Hosiery Mills, and he said no, he wanted the goods for his own personal use, and if I would bill them to Sheertex Hosiery he would see that I would get payment for them, and guaranteed payment. * * * We mentioned Diamond because it was a local concern and that we did know of Diamond Hosiery Mills and did not know anything of Sheertex, but I realized Mr. Goldsmith wanted the goods for himself. * * * Mr. Goldsmith told me that he was president and owned a majority of the stock of Sheertex Hosiery Company, and he would see to it that we would get our payments promptly on Friday after he received our invoices."

All discussions, conferences and agreements as to the purchase of the goods were between plaintiff and defendant.

In accordance with the instructions the goods were invoiced to Sheertex Hosiery, Inc., and copies of all invoices sent to defendant at his New York office, marked for his personal attention. All invoices were paid by check of Sheertex Hosiery, Inc., signed by A. P. Goldsmith, President.

On December 2, 1946, the defendant sent the following telegram to plaintiff: "J. Z. Erwin, Erwin Sutton Hosiery Mills Graham NCAR RETEL had difficulty getting express to pick up last weeks yarn shipment to you so had no alternative but to ship via Associated past Saturday approximately 600 pounds 75's and 300 pounds 80's Stop In addition to this express picking up tomorrow morning one case each 75's and 80's Stop Try if possible to get Rankin to help you and repay the yarn as soon as you can Stop Please ship maximum quantities nylons" Signed, "A. Phillip Goldsmith".

The plaintiff received payment of thirty-six invoices totalling the sum of approximately $162,000, before the last four invoices, involved herein, were rejected, which were for hose of the same first-class quality as the hose covered by the thirty-six invoices. This rejection was coincident with a sharp drop in the market price of such hose. After complaints by defendant as to the hose covered by the last four invoices, the plaintiff agreed to take back all hose that was in the greige. Defendant, or Sheertex, shipped back some hose and the shipment reached its destination, but was never delivered to plaintiff, because delivery was stopped, and it was returned to the plant of Sheertex, whereupon this shipment, together with a quantity of finished hose which had been sold and delivered by plaintiff to defendant in the greige, was sold under process in an attachment suit brought in New Jersey by Sheertex against plaintiff, and at such sale was bid in for $125 for Sheertex.

The defendant did not testify.

The North Carolina Statute of Frauds, General Statutes of North Carolina, Section 22-1, is as follows: "No action shall be brought whereby to charge an executor, administrator or collector upon a special promise to answer damages out of his own estate or to charge any defendant upon a special promise to answer the debt, default or miscarriage of another person, unless the agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party charged therewith or some other person thereunto by him lawfully authorized."

In discussing the difference between an original promise, which is not within the statute of frauds, and a superadded one, which is within the statute, the North Carolina Supreme Court in the case of Farmers Federation, Inc. v. Morris, 223 N.C. 467, 27 S.E.2d 80, 81, said: "Whether a promise is an original one not coming within the statute of frauds, or a collateral one required by the statute to be in writing, is

to be determined from the circumstances of its making, the situation of the parties, and the objects sought to be accomplished. Simmons v. Groom, 167 N.C. 271, 83 S.E. 471; Balentine v. Gill, 218 N.C. 496, 11 S.E.2d 456; Dozier v. Wood, 208 N.C. 414, 181 S.E. 336. Where the intent is doubtful, the solution usually lies in summoning the aid of a jury. Whitehurst v. Padgett, 157 N.C. 424, 73 S.E. 240. * * * 'Anything which shows the intention or the actual contract of the parties is material, and any evidence which goes to show the real intention of the parties is admissible whether it be by way of conduct or documentary in nature.'"

In the case of Dozier v. Wood, 208 N. C. 414, 181 S.E. 336, 337, The North Carolina Supreme Court declared: "* * * the plaintiff is entitled to a liberal view of evidence. * * * Discrepancies and contradictions, even in plaintiff's evidence, are matters for the jury, and not for the court."

In Brown v. Benton, 209 N.C. 285, 183 S.E. 292, two individual defendants ordered two or three cars of lumber shipped to B. L. Johnson & Co., Inc., at Roaring River. The understanding was that the lumber was to be shipped and billed to B. L. Johnson & Co., Inc. and that the individual defendants would be personally responsible to the plaintiff. One of the individual defendants told the plaintiff that they would need another car, the same as was shipped before and said, "The arrangement is you are to ship it and Finley and myself will be responsible for it". In this case the plaintiff testified that he knew that the individual defendants had taken over the B. L. Johnson & Co., Inc., that they were the main stockholders. Under such facts, the Supreme Court of North Carolina said, "The only point mooted on trial was whether the promise of the defendants went beyond the first car of lumber and included the second. The jury found that it did. This was an issue of fact determinable alone by the twelve."

Considering the circumstances of its making, the situation and interests of the parties, the objects sought to be accomplished, the intent of the parties, the conduct of the parties and the documentary evidence, in the most favorable light for the plaintiff, it was for the jury to say whether the promise of the defendant was within the statute, or was not within the statute, and the Trial Judge committed no error in submitting this question to the jury. Brown v. Benton, 209 N.C. 285, 183 S.E. 292; Peele v. Powell, 156 N.C. 553, 73 S.E. 234; Dozier v. Wood, 208 N.C. 414, 181 S.E. 336; Taylor v. Lee, 187 N.C. 393, 121 S.E. 659; Farmers Federation, Inc., v. Morris, 223 N.C. 467, 27 S.E.2d 80. Furthermore, there was direct testimony from which the jury could have concluded that the contract for the purchase of the goods was made for the sole benefit of the defendant and that he had a personal, immediate and pecuniary benefit in the transaction.

At the conclusion of the Judge's Charge the defendant orally requested the Judge to explain to the jury the difference between an original promise and a collateral promise in the language of the case of Peele v. Powell, 156 N.C. 553, 73 S.E. 234. Complying with this request, the District Judge charged the jury as follows: "I thought I pointed out to you the difference between what is meant by an original promise as to make one liable under it as an original obligor, and one where it is a super-added or collateral agreement. It is important for you to know the difference between the two. If I have not pointed it out, I want to do so now.

"The obligation is original if made at the time or before the debt is created, and the credit is given in consideration of the promise made by the promisor.

"The definition of a promise to answer for the debt of another, which is not enforceable, as adopted by the Supreme Court of North Carolina is: 'An undertaking by a person not before liable for the purpose of securing or performing the same duties for which the party for whom the undertaking is made continues liable.'"

The appellant contends that while the District Judge gave the definition from Peele v. Powell, as requested, of both an original promise and a collateral promise, he proceeded to explain away the definition

by the following illustration. "Perhaps, I can illustrate this one further way that might clarify the issue to you. If a debt has already been made and the party is already bound under it, and a third party comes in and promises to pay it or to assume the responsibility for it, the third party isn't liable there, because the credit wasn't extended on the basis of that, and that is the promise to answer for the debt, default or miscarriage of somebody else, which has to be in writing before it can be enforced. But if the person who goes before the credit is extended and says to another 'if you will give this credit to thus and so I'll see that it is paid', that promise on his part to see that it is paid constitutes an original obligation on the person making the promise that 'if you do extend credit I will see it is paid'; and whatever credit is extended by virtue of that becomes binding on him because his promise to see that it is paid makes him responsible for it."

The illustration given by the Trial Judge is in accordance with the decisions of the North Carolina Supreme Court. In the case of Farmers Federation, Inc., v. Morris, 223 N.C. 467, 27 S.E.2d 80, the Supreme Court of North Carolina, said: "The instant case comes well within the example put by Mr. Clark in his work on Contracts, 67: 'If, for instance, two persons come into a store and one buys and the other, to gain him credit, promises the seller, "If he does not pay you, I will", this is a collateral undertaking and must be in writing; but if he says, "Let him have the goods and I will pay", or "I will see you paid", and credit is given to him alone, he is himself the buyer, and the undertaking is original.'"

In a case where the landlord made a statement to a storekeeper, when he and the tenant made arrangements whereby the storekeeper was to furnish the tenant supplies, that the tenant would "be on our land this year and you sell him anything he wants and I will see it paid", the State Supreme Court decided that such statement under such circumstances was sufficient to warrant a finding that the promise was an original one, and not within the statute of frauds. Taylor v. Lee, 187 N.C. 393, 121 S.E. 659.

An examination of the Trial Judge's Charge discloses that he clearly declared the law of North Carolina in defining the difference between an original promise and a collateral promise, and the illustration used in his Charge, and complained of by appellant, did not create any confusion in the minds of the jurors. Brown v. Benton, supra; Peele v. Powell, supra; Dozier v. Wood, supra. The learned District Judge stated the contentions of the plaintiff and the defendant in a very thorough and able Charge, in which we find no error.

Affirmed.